Doris M. SAMPLE, Plaintiff,

v.

Jo Anne B. BARNHART,[1] Commissioner of Social Security, Defendant.

No. CIV.A.01–645–JJF.

United States District Court, D. Delaware.

Dec. 30, 2002.

---

1. Jo Anne Barnhart became the Commissioner of Social Security, effective November 14, 2001, to succeed Acting Commissioner Larry G. Massanari, who succeeded Commissioner Kenneth S. Apfel. Pursuant to Federal Rule of Civil Procedure 25(d)(1) and 42 U.S.C. § 405(g), Jo Anne Barnhart is automatically substituted as the defendant in this action.

and this matter will be remanded to the Commissioner for further findings and/or proceedings consistent with this Memorandum Opinion.

Gary C. Linarducci, New Castle, Delaware, Attorney for Plaintiff.

Colm F. Connolly, United States Attorney, and Virginia Gibson–Mason, Assistant United States Attorney, of the Office of the United States Attorney, Wilmington, Delaware, Social Security Administration, Philadelphia, Pennsylvania (James A. Winn, Regional Chief Counsel, and Anne von Scheven, Assistant Regional Counsel, of counsel), Attorneys for Defendant.

## MEMORANDUM OPINION

FARNAN, District Judge.

Presently before the Court is an appeal pursuant to 42 U.S.C. §§ 405(g) filed by Plaintiff, Doris M. Sample, seeking review of the final decision of the Commissioner of the Social Security Administration denying Plaintiff's claims for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401–433. Plaintiff has filed a Motion For Summary Judgment (D.I.7) requesting the Court to grant her benefits as a matter of law, or alternatively, remand this case to the Commissioner. In response to Plaintiff's Motion, Defendant has filed a Cross–Motion For Summary Judgment (D.I.9) requesting the Court to affirm the Commissioner's decision. For the reasons set forth below, Defendant's Cross–Motion For Summary Judgment will be denied, and Plaintiff's Motion For Summary Judgment will be granted to the extent that it seeks a remand of this case, and denied to the extent that it seeks entry of judgment that Plaintiff is entitled to benefits as a matter of law. The decision of the Commissioner dated February 28, 2000 will be reversed,

## BACKGROUND

### I. Procedural Background

Plaintiff filed her application for DIB on January 8, 1998, alleging disability as of June 22, 1989, due to carpal tunnel syndrome, a broken ankle, arthritis, heart problems and a pinched nerve in her back. (Tr. 53–55, 58). Plaintiff's application was denied initially and on reconsideration. (Tr. 39–43, 47–50).

Plaintiff appealed the denial of her application and an administrative law judge (the "A.L.J.") conducted a hearing on Plaintiff's claim. By decision dated February 28, 2000, the A.L.J. denied Plaintiff's claim for DIB finding that prior to Plaintiff's date last insured of March 31, 1995, Plaintiff could perform a limited range of light work, and was therefore not disabled. (Tr. 13–24). Following the unfavorable decision, Plaintiff filed a timely Request For Review Of Hearing Decision. (Tr. 8). On August 15, 2001, the Appeals Council denied Plaintiff's request for review. (Tr. 4–5).

After completing the process of administrative review, Plaintiff filed the instant civil action pursuant to 42 U.S.C. § 405(g), seeking review of the A.L.J.'s decision denying her claim for DIB. In response to the Complaint, Defendant filed an Answer (D.I.5) and the Transcript (D.I.4) of the proceedings at the administrative level.

Thereafter, Plaintiff filed a Motion For Summary Judgment (D.I.7) and Opening Brief (D.I.8) in support of the Motion. In response, Defendant filed a Cross–Motion For Summary Judgment (D.I.9) and a combined Answering Brief and Opening Brief (D.I.10) requesting the Court to af-

firm the A.L.J.'s decision. Plaintiff file a Reply Brief to Defendant's Cross–Motion (D.I.12), and therefore, this matter is ripe for the Court's review.

## II. Factual Background

### A. *Plaintiff's Medical History, Condition and Treatment*

Plaintiff was forty-six years old when she alleged that she became disabled and fifty-one years old when her insured status expired on March 31, 1995. Plaintiff has a tenth grade education and past relevant work experience as a cleaner and a line worker/inspector in a poultry plant from 1973 until 1989. (Tr. 59, 64). Plaintiff last worked on June 22, 1989 when she alleged she became disabled. (Tr. 58).

#### 1. Mild Chronic Interstitial Lung Disease

Prior to alleging disability, the medical evidence reveals that Plaintiff had a chest x-ray on November 8, 1985, which showed mild chronic interstitial lung disease. (Tr. 118). A subsequent x-ray taken on October 13, 1992, showed no evidence of active disease. (Tr. 223).

#### 2. Carpal Tunnel Release Surgery

The record also indicates that Plaintiff had a history of carpal tunnel release surgery on both of her wrists. On October 14, 1985, Harry Freedman, M.D. performed a release of transverse carpal ligament and aponeurolysis of the left median nerve. (Tr. 117). Following the surgery, Dr. Freedman referred Plaintiff to Tidewater Electromyography for a nerve conduction study. The study was performed on January 8, 1987, and revealed a mild to moderate compromise of the left median, nerve across the wrist and a mild compromise of the right median nerve across the wrist. (Tr. 116).

Dr. Freedman further diagnosed Plaintiff with carpal tunnel syndrome of the right wrist. On June 10, 1987, Dr. Freedman performed a release of transverse carpal ligament and epineurolysis of median nerve, right wrist. (Tr. 113). Following surgery, Dr. Freedman referred Plaintiff to physical therapy at Tidewater Physical Therapy and Rehabilitation Associates, P.A. to increase her strength and range of motion. At her initial evaluation one month after surgery on July 20, 1987, Plaintiff exhibited a grip strength of ten pounds on the right hand and forty-five pounds on the left hand. (Tr. 108). Plaintiff also complained that she had to use her dominant hand to clean chicken gizzards, which exacerbated her carpal tunnel syndrome.

On July 31, 1990, Dr. Freedman issued a note indicating that Plaintiff could return to work as of August 6, 1990. However, Dr. Freedman limited Plaintiff to a light duty, sit down job which required no repetitive motions of the hands. (Tr. 103).

#### 3. Left Ankle

On June 22, 1989, Plaintiff slipped and fell on a wet floor, breaking her left ankle. (Tr. 105). Plaintiff underwent an open reduction and internal fixation of the left ankle by Dr. Sopa. Dr. Sopa placed a plate on the distal fibula and two screws in the medial malleoulus. (Tr. 119). After this surgery, Plaintiff underwent a second surgery to remove the two screws. (Tr. 119).

#### 4. Hypertension

Plaintiff also treated with Romeo A. Escaro, M.D. for hypertension. On June 14, 1986, Dr. Escaro noted that Plaintiff was sent home from work. At that time, her blood pressure was 160/110, and Dr. Escaro noted that Plaintiff experienced dizziness and a headache with her elevated blood pressure. (Tr. 260).

On July 19, 1986, Plaintiff returned to Dr. Escaro. She had been out of work for three days due to dizziness and headaches. Her blood pressure at that visit was 140/98. Dr. Escaro prescribed Cogard and Dyazide to treat Plaintiff's hypertension. (Tr. 253).

On October 1987, Plaintiff again reported to Dr. Escaro. Her blood pressure at that visit was 170/98. (Tr. 237). Dr. Escaro continued Plaintiff's prescription for Dyazide.

On February 15, 1988, Dr. Escaro noted that Plaintiff slipped and fell on ice. Plaintiff had pain and swelling of the left hip, and her blood pressure was 190/70. (Tr. 231).

On August 27, 1993, Plaintiff reported to Dr. Escaro. At that visit, Plaintiff's blood pressure was 160/120. Dr. Escaro also diagnosed Plaintiff with "borderline diabetes." (Tr. 212). However, medical records from May 19, 1995 show that Plaintiff's blood glucose level was within normal limits. (Tr. 200).

In subsequent visits to Dr. Escaro, Dr. Escaro continued to note Plaintiff's high blood pressure. Dr. Escaro also gave Plaintiff some medications for her right wrist and hand pain including Relafen, Darvocet, Accupril and Corgard. (Tr. 205).

5. Medical Reports and Reviews From Other Physicians

On April 22, 1991, Plaintiff underwent an independent medical evaluation of the upper extremities with David T. Sowa, M.D., an orthopedist in connection with her claim for workers compensation benefits. (Tr. 121–122). The examination revealed negative Tinel's and Phalen's signs over both wrists, intact median nerve sensory function, and no thenar atrophy. (Tr. 121). Plaintiff had full range of motion in both wrists and grip strength of 40 pounds on the left and 22 pounds on the right. (Tr. 122). Dr. Sowa questioned Plaintiff's cooperation on her testing, because the only objective finding to support her persistent complaints of disability in both upper extremities was her diminished grip strength on the right as compared to the left. (Tr. 122).

On September 16, 1991, Plaintiff underwent a second independent medical evaluation by Dr. Sowa. At this examination, Dr. Sowa focused on her lower left extremity. (Tr. 119–120). Dr. Sowa indicated that Plaintiff had experienced a bimalleolar fracture of her left ankle on June 22, 1989. His examination revealed that she walked with a significant limp, her left ankle was swollen and she had limited range of motion in her left ankle. (Tr. 119). X-rays of her left ankle showed that her left distal fibula fracture had healed, but that there was significant degenerative changes of the medial tibio-talar joint, joint space narrowing, and osteophyte formation. (Tr. 120). Dr. Sowa concluded that these findings were consistent with post-traumatic degenerative changes of the medial tibio-talar. Based on his findings, Dr. Sowa assigned Plaintiff an 18% partial disability for purposes of her workers compensation claim. (Tr. 120).

In response to an inquiry from her attorney in connection with her DIB case, Dr. Freedman provided a narrative report on Plaintiff's condition on January 10, 2000. In this letter, Dr. Freedman stated that the repetitive motions Plaintiff performed at work for many years at the poultry processing plant resulted in a "repetitive strain condition [which] precluded her from performing repetitive motions in the poultry processing plant between 1989 and March 31, 1995." (Tr. 319). Dr. Freedman also noted Plaintiff's broken ankle and stated that he subsequently saw

her for an examination in 1991. According to Dr. Freedman, Plaintiff "was unable to stand at work because of the persistent pain and swelling of the ankle even after the hardware was removed." (Tr. 319). Dr. Freedman noted that Plaintiff tried light duty work, but could only work for two days because of the pain. In sum, Dr. Freedman concluded that Plaintiff was precluded from doing any kind of work because: (1) the condition of bilateral carpal tunnel syndrome precluded her from repetitive pushing, pulling and repetitive motions of the hands; and (2) the condition of the lower extremity prevented her from standing. (Tr. 319).

### B. *The A.L.J.'s Decision*

On December 8, 1999, the A.L.J. conducted a hearing on Plaintiff's DIB claim. At the hearing, Plaintiff testified that she drives, does most of the housework and cooking and occasionally does the shopping. (Tr. 324). Plaintiff testified that her recent problems included her ankle and that she couldn't do more than fifteen or twenty minutes of standing without swelling and pain. Plaintiff also testified that she had hypertension, shortness of breath and chest pains. Plaintiff further testified that between 1990 and 1995, she experienced difficulty sitting (Tr. 331), difficulty grasping and holding things with her hands (Tr. 332, 333), and back problems such that she could only sit for fifteen or twenty minutes and stand for thirty minutes. (Tr. 334). Plaintiff also testified that before she broke her ankle she would sometimes miss work once a week due to hypertension, but then she would go a few weeks without any problems. (Tr. 335).

Following Plaintiff's testimony, the A.L.J. sought testimony from a vocational expert to determine whether there was a significant number of alternative jobs in the national economy that an individual such as Plaintiff could perform. (Tr. 338). The A.L.J. asked the vocational expert to consider a hypothetical individual with Plaintiff's age between 1989 and 1995, her education and past work experience, who would be limited to entry-level, light jobs that did not require repetitive use of the upper extremities or standing or walking for the entire day. (Tr. 341). Based on this hypothetical, the vocational expert testified that such an individual could perform the unskilled light jobs of: (1) gate tender with 250 jobs locally and 65,000 nationally, usher; (2) usher/lobby attender with 150 jobs locally and 42,000 nationally; (3) office helper with 200 jobs locally and 45,000 nationally; (4) security monitor with 200 jobs locally and 55,000 nationally; (5) telephone sales/surveyor with 400 jobs locally and 75,000 nationally; and (6) information clerk with 300 jobs locally and 45,000 nationally. (Tr. 342–345).

In his decision dated February 28, 2000, the A.L.J. concluded that Plaintiff suffered from status-post bilateral carpal tunnel releases, a status-post left ankle fracture, arthritis of the left ankle, chronic interstitial lung disease, peptic ulcer disease, obesity, hypertension and diabetes melitus impariments, which were severe conditions, but did not meet or equal impairments listed in Appendix 1, Subpart P, Regulations No. 4. The A.L.J. also found that Plaintiff's statements concerning her impairments and their impact on her ability to work were not fully credible "in light of the claimant's own description of her activities, the degree of medical treatment required, discrepancies between the claimant's assertions and information contained in the documentary reports, the reports of the treating and examining practitioners, the medical history and the findings made on examination." (Tr. 22). The A.L.J. also found that on the date her insured status expired, Plaintiff had the residual functional capacity ("RFC") to sit

and/or stand for up to 6 hours in an 8 hour work day, but she could not perform jobs which required walking. The A.L.J. also found that Plaintiff could occasionally lift and carry up to 20 pounds and frequently lift and carry up to 10 pounds. The A.L.J. further found Plaintiff's ability to perform light work to be diminished by "significant non-exertional limitations which made it impossible for her to perform repetitive tasks with her upper extremities." Despite these limitations, the A.L.J. concluded that Plaintiff could perform a significant number of jobs in the national economy, and therefore, Plaintiff was not disabled within the meaning of the Social Security Act.

## STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 405(g), findings of fact made by the Commissioner of Social Security are conclusive, if they are supported by substantial evidence. Accordingly, judicial review of the Commissioner's decision is limited to determining whether "substantial evidence" supports the decision. *Monsour Medical Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir.1986). In making this determination, a reviewing court may not undertake a de novo review of the Commissioner's decision and may not re-weigh the evidence of record. *Id.* In other words, even if the reviewing court would have decided the case differently, the Commissioner's decision must be affirmed if it is supported by substantial evidence. *Id.* at 1190–91.

The term "substantial evidence" is defined as less than a preponderance of the evidence, but more than a mere scintilla of evidence. As the United States Supreme Court has noted substantial evidence "does not mean a large or significant amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

*Pierce v. Underwood*, 487 U.S. 552, 555, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988).

With regard to the Supreme Court's definition of "substantial evidence," the Court of Appeals for the Third Circuit has further instructed, "A single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores or fails to resolve a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence ... or if it really constitutes not evidence but mere conclusion." *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir.1983). Thus, the substantial evidence standard embraces a qualitative review of the evidence, and not merely a quantitative approach. *Id.; Smith v. Califano*, 637 F.2d 968, 970 (3d Cir.1981).

## DISCUSSION

### I. Evaluation Of Social Security Disability Claims

Within the meaning of social security law, a "disability" is defined as the "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment." 20 C.F.R. § 404.1505(a). To be found disabled, an individual must have a "severe impairment" which precludes the individual from performing previous work or any other "substantial gainful activity which exists in the national economy." *Id.* The claimant bears the initial burden of proving disability. 42 U.S.C. § 423(d)(5).

In determining whether a person is disabled, the Regulations require the A.L.J. to perform a sequential five-step analysis. 20 C.F.R. § 404.1520. In step one, the A.L.J. must determine whether the claimant is currently engaged in substantial gainful activity. In step two, the A.L.J. must determine whether the claimant is suffering from a severe impairment. If the claimant fails to show that his or her

impairment is severe, he or she is ineligible for benefits. *Plummer v. Apfel,* 186 F.3d 422, 427 (3d Cir.1999).

If the claimant's impairment is severe, the A.L.J. proceeds to step three. In step three, the A.L.J. must compare the medical evidence of the claimant's impairment with a list of impairments presumed severe enough to preclude any substantial gainful work. *Id.* at 428. If the claimant's impairment meets or equals a listed impairment, the claimant is considered disabled. If the claimant's impairment does not meet or equal a listed impairment, the A.L.J.'s analysis proceeds to steps four and five. *Id.*

In step four, the A.L.J. is required to consider whether the claimant retains the residual functional capacity to perform his or her past relevant work. *Id.* The claimant bears the burden of establishing that he or she cannot return to his or her past relevant work. *Id.*

In step five, the A.L.J. must consider whether the claimant is capable of performing any other available work in the national economy. At this stage the burden of production shifts to the Commissioner, who must show that the claimant is capable of performing other work if the claimant's disability claim is to be denied. *Id.* In making this determination, the A.L.J. must show that there are other jobs existing in significant numbers in the national economy, which the claimant can perform consistent with the claimant's medical impairments, age, education, past work experience and residual functional capacity. *Id.* In making this determination, the A.L.J. must analyze the cumulative effect of all of the claimant's impairments. It is at this step, that the A.L.J. may seek the assistance of a vocational expert. *Id.* at 428.

## II.   Plaintiff's Contentions Of Error

Plaintiff raises three contentions of error in this appeal. First, Plaintiff contends that the A.L.J. failed to provide a basis for rejecting an opinion from Plaintiff's treating physician, Dr. Freedman. (D.I.10). Second, Plaintiff contends that the A.L.J. incorrectly applied the Grids to Plaintiff's claim. (D.I.10). Third, Plaintiff contends that the A.L.J. breached his duty to develop the record by failing to consider Dr. Freedman's January 10, 2000 letter. (D.I.12).

The opinion of Dr. Freedman dated January 10, 2000 was submitted to the A.L.J. nearly twenty days after the record was closed in this case. For this reason, the A.L.J. did not consider Dr. Freedman's opinion when he rendered his decision. However, the opinion was forwarded to the Appeals Council where it was considered as an exhibit. Upon consideration of this evidence, the Appeals Council concluded that the newly submitted evidence was not material to the issue of whether Plaintiff was disabled at the time she met the insured status requirement. Thus, the Appeals Council denied Plaintiff's request for review finding that the A.L.J.'s decision was not contrary to the weight of the record evidence. See 20 C.F.R. § 404.970(b).

When the Appeals Council has considered additional evidence that was not before the A.L.J. and the Appeals Council has denied review of the A.L.J.'s decision, the district court may remand the case to the Commissioner to consider the additional evidence if: (1) the evidence is new and not cumulative of what is already in the record; (2) the evidence is material, that is relevant and probative, and there is a reasonable probability that it would have changed the outcome of the Commissioner's decision; and (3) the plaintiff has demonstrated good cause for not having incor-

porated the evidence into the record. *Matthews v. Apfel,* 239 F.3d 589, 592 (3d Cir.2001); *Szubak v. Secretary of Health and Human Services,* 745 F.2d 831, 833 (3d Cir.1984). "Good cause" is established when there is "some justification for a claimant's failure to have acquired and presented such evidence to the A.L.J." *Cunningham v. Apfel,* 2001 WL 892796, *8 (Aug. 2, 2001) (citing *Matthews,* 239 F.3d at 594–595).

■ In this case, the Commissioner contends that Dr. Freedman's January 10, 2000 letter is immaterial and contrary to the other record evidence provided by Dr. Freedman. After reviewing the Dr. Freedman's letter in light of the medical record, the Court disagrees. The Commissioner contends that Dr. Freedman's letter is immaterial because it does not relate to the time period of Plaintiff's claim. The Commissioner's assertion ignores the content of Dr. Freedman's letter. Although the letter is dated January 10, 2000, its contents refer to Plaintiff's previous treatment with Dr. Freedman, including a subsequent 1991 examination which is expressly referenced in the letter. (Tr. 319). Plaintiff maintained insured status until March 31, 1995, and therefore, Dr. Freedman's letter is relevant to the time frame of Plaintiff's claim.

In addition, the letter does not appear to contradict Dr. Freedman's other medical findings. Rather, the letter appears to be an adjustment of Dr. Freedman's opinions of July 31, 1990, based on a subsequent examination of Plaintiff in 1991. In assessing Plaintiff's RFC, the A.L.J. particularly noted Dr. Freedman's July 31, 1990 opinion that Plaintiff could perform light or sedentary work which did not require repetitive hand motions. Given that the A.L.J. accepted the initial findings of Dr. Freedman, the Court cannot say that Dr. Freedman's subsequent letter would not have impacted the way in which the A.L.J. evaluated Plaintiff's claim. Moreover, the Court believes that the A.L.J. should have the opportunity to consider this additional evidence in light of the other evidence and make a determination as to whether the opinion of Plaintiff's treating physician should continue to be accepted or should be rejected for specified reasons. Accordingly, the Court concludes that Dr. Freedman's January 10, 2000 letter is new and material evidence which could reasonably have changed the A.L.J.'s decision.

■ Although the Commissioner does not contend that Plaintiff lacked good cause for failing to incorporate this evidence into the record before the A.L.J., the Court, in any event, finds that Plaintiff has established good cause. Counsel made a good faith effort to obtain the additional information from Dr. Freedman before the A.L.J. closed the record in this case. *See e.g. Cunningham v. Apfel,* 2001 WL 892796, *8 (E.D.Pa. Aug.2, 2001) (finding good cause based on counsel's good faith efforts to obtain the reports before the A.L.J. closed the record). Dr. Freedman's January 10, 2000 letter is a response to a letter that Plaintiff's counsel's sent on December 3, 1999, prior to the administrative hearing. Further, in a letter sent to the A.L.J. two days after the hearing, counsel indicating that he would be attempting to obtain additional medical information from Dr. Freedman, including a narrative report, and that he would forward the information as soon as he received it. (Tr. 161). Plaintiff's counsel received the letter from Dr. Freedman on January 19, 2000, and immediately forwarded it to the A.L.J.

In sum, the Court concludes that Plaintiff has established that a remand is warranted in this case to allow the A.L.J. to consider Plaintiff's newly submitted evidence. Accordingly, the Court will reverse the decision of the Commissioner dated

February 28, 2002, and remand this matter to the Commissioner for further findings and/or proceedings consistent with this Memorandum Opinion.

## CONCLUSION

For the reasons discussed, Defendant's Motion For Summary Judgment will be denied, and Plaintiff's Motion For Summary Judgment will be granted to the extent that it seeks a remand of this case, and denied to the extent that it seeks an entry of judgment that Plaintiff is entitled to benefits as a matter of law. The decision of the Commissioner dated August 4, 1999 will be reversed, and this matter will be remanded to the Commissioner for further findings and/or proceedings consistent with this Memorandum Opinion.

An appropriate Order will be entered.

## *ORDER*

At Wilmington, this 30th day of December 2002, for the reasons discussed in the Memorandum Opinion issued this date;

IT IS HEREBY ORDERED that:

1. Defendant's Cross–Motion For Summary Judgment (D.I.9) is DENIED.

2. Plaintiff's Motion For Summary Judgment (D.I.7) is GRANTED to the extent that it seeks a remand of this case, and DENIED to the extent that it seeks an entry of judgment that Plaintiff is entitled to benefits as a matter of law.

3. The final decision of the Commissioner dated August 4, 1999 is REVERSED, and this matter is REMANDED to the Commissioner for further findings and/or proceedings consistent with this Memorandum Opinion.